**SO ORDERED.**

**SIGNED this 5 day of September, 2014.**



_____
**David M. Warren
United States Bankruptcy Judge**

_____

## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF NORTH CAROLINA
## RALEIGH DIVISION

| | |
|---|---|
| IN RE: | CASE NO. 13-05843-8-SWH |
| **WILLIAM ROBERT ANDERSON, JR.** and **DANNI SUE JERNIGAN,** | |
| | CHAPTER 13 |
| **DEBTORS.** | |

### ORDER ALLOWING OBJECTION TO TRUSTEE'S MOTION FOR CONFIRMATION AND ORDER CONFIRMING PLAN

This matter comes on to be heard upon the Minutes of 341 Meeting and Motion for Confirmation of Plan ("Motion for Confirmation") filed by John F. Logan, Esq. ("Trustee"), and the Objection to Confirmation filed by Wayne and Tina Hancock ("Hancocks"). The court conducted a hearing in Raleigh, North Carolina on May 21, 2014. Cort I. Walker, Esq. appeared for William Robert Anderson, Jr. and Danni Sue Jernigan ("Debtors"), and Theodore A. Nodell, Esq. appeared on behalf of the Hancocks. The Trustee was also present. At the conclusion of the hearing, Mr. Walker formally objected to the court's allowance of the Objection to Confirmation, consistent with the Debtors' position asserted during the hearing. Confirming its ruling at the hearing, the court makes the following findings of fact and conclusions of law:

1. This matter is a core proceeding pursuant to 28 U.S.C. § 157, and the court has jurisdiction pursuant to 28 U.S.C. §§ 151, 157, and 1334. The court has the authority to hear this matter pursuant to the General Order of Reference entered August 3, 1984 by the United States District Court for the Eastern District of North Carolina.

2. The Debtors filed a petition for relief under Chapter 13 of the United States Bankruptcy Code on September 16, 2013 ("Petition Date").

3. On September 1, 2011, the Debtors executed a Promissory Note ("Note") in the original principal amount of $255,000.00 in favor of the Hancocks. The Debtors executed the Note in conjunction with the Debtors' purchase of 6137 Wolverhampton Drive, Raleigh, North Carolina ("Property") which the Debtors use as their primary residence. To secure the repayment of the Note, the Debtors granted a purchase money deed of trust upon the Property in favor of the Hancocks.

4. Under the pre-default terms of the Note, the Debtors were required to make monthly payments to the Hancocks in the amount of $1,368.90. This monthly payment amount is calculated based upon an interest rate of 5.00% over a repayment term of 30 years.

5. Pursuant to Section 6 of the Note, captioned "Borrower's Failure to Pay as Required," the Hancocks have two options in the event a monthly payment is not made within 30 days of its due date. Upon written notice of default, the Hancocks may either:

    a. Elect for the interest rate on the Note to increase to 7.00% "for the remaining term of the loan until paid in full;" or

    b. Accelerate the Note, requiring Debtors to pay immediately the full balance of principal and interest on the Note.

6. The Note further provides that in the event the interest rate is increased to 7.00%, the corresponding monthly payment will be $1,696.52 for the remainder of the loan term until the Note is paid in full.

7. The Debtors failed to remit timely their April, 2013 payment to the Hancocks, and that payment remained delinquent for over 30 days.

8. On May 4, 2013, Mr. Hancock notified the Debtors, via electronic mail sent to the male Debtor, that the Note was in default, and that beginning with the May, 2013 payment and throughout the remainder of the loan term, the monthly payments would be $1,696.52 pursuant to Section 6 of the Note.

9. On May 6, 2013, the male Debtor responded to Mr. Hancock's email and requested that, rather than raising the interest rate, Mr. Hancock provide the Debtors with the opportunity to become current on the Note. Mr. Hancock replied to the male Debtor's email the same day, and stated "[w]e will work with you," apparently implying that the Hancocks may be amenable to the Debtors becoming current without the default rate being instituted. Mr. Hancock also suggested that the Debtors attempt to refinance the balance of the Note through an institutional lender.

10. Mr. Hancock again emailed the male Debtor on May 16, 2013, stating that neither the April nor May payments had been received. Mr. Hancock gave the Debtors until May 19, 2013 to remit the April, 2013 payment to the Hancocks and to submit a payment plan for the balance of the arrears. The male Debtor sent emails to Mr. Hancock on May 16 and 17, 2013, stating that he planned to make the April payment sometime before May 31, 2013.

11. On June 3, 2013, after the Debtors failed to make any payment to the Hancocks, Mr. Hancock emailed the male Debtor and, consistent with prior communications, informed him

that beginning with the June 1, 2013 payment, the monthly payment amount would increase to $1,696.52 for the remainder of the loan term.

12. The Debtors' delinquency on the Note continued, and the Hancocks eventually elected to accelerate the Note. The Hancocks initiated foreclosure proceedings on August 30, 2013. The bankruptcy filing on September 16, 2013 stayed those proceedings. On June 3, 2014, the Hancocks filed an amended proof of claim, designated by the court as Claim No. 3, in the amount of $261,247.99 as of the Petition Date.

13. The Motion for Confirmation proposes payments to the Hancocks in the pre-default monthly amount of $1,368.90, rather than the post-default monthly amount of $1,696.52. In support of the treatment proposed under the Plan, the Debtors argue that 11 U.S.C. §§ 1322(b)(3) and (b)(5) allow for a plan to cure any default. The cure, as proposed by the Debtors, includes paying all of the pre-petition arrears through the Plan and using the 5.00% pre-default rate of interest on the post-petition contractual payments.

14. In support of their contention that the pre-default monthly payment amount is the appropriate amount to be paid by the Debtors through the Plan, the Debtors cite *Litton v. Wachovia Bank (In re Litton)*, 330 F.3d 636 (4th Cir. 2003). *Litton* involves the interplay of two subsections of 11 U.S.C. § 1322(b), (b)(2) and (b)(5):

    a. Subsection (b)(2) prohibits the modification by a Chapter 13 plan of "a claim secured only by a security interest in real property that is the debtor's principal residence." 11 U.S.C. § 1322(b)(2).

    b. Subsection (b)(5) states that notwithstanding 11 U.S.C. § 1322(b)(2), a plan may "provide for the curing of any default within a reasonable time and maintenance of payments while the case is pending on any unsecured claim or secured claim on which

4

the last payment is due after the date on which the final payment under the plan is due."
11 U.S.C. § 1322(b)(5).

15. In *Litton*, the debtor owned real property subject to a deed of trust held by Wachovia. The debtor became delinquent on payments to Wachovia and filed a Chapter 13 petition. The debtor and Wachovia executed an agreement whereby the debtor agreed to dismiss her case and pay a lump sum by a particular date, followed by monthly payments to Wachovia. 330 F.3d at 641. Upon the debtor's failure to pay timely the lump sum, Wachovia moved to foreclose and the debtor filed a second Chapter 13 bankruptcy petition. *Id.* The debtor's plan proposed to pay the lump sum and resume monthly payments, essentially reinstating the underlying agreement. *Id.*

16. The *Litton* court held that deceleration of a debt and the reinstatement of a note did not constitute a modification prohibited by § 1322(b)(2), because the debtor was curing the default and returning to the terms of the agreement that was in place prior to foreclosure and the ensuing second bankruptcy. *Id.* at 644.

17. *Litton* and other cases that hold that the right to cure default within the meaning of § 1322(b)(5) includes returning the parties to their respective pre-default positions are distinguishable from the matter before the court, because they contemplate situations in which the only consequence of default is acceleration of the debt. In other words, the only provision of the underlying agreement that was affected by cure was the acceleration clause. By contrast, in the Debtors' case, the cure as proposed by the Debtors would lead to a fundamental alteration of the terms of the Note. By the terms of the Note, the interest rate increased by 2.00% when the payments became more than 30 days delinquent.

5

18. Despite being distinguishable, *Litton* and its progeny can nevertheless coexist with a finding that while cure allows for a previously accelerated loan to be reinstated, the concept of cure does not expand to allow a debtor to reinstate a promissory note and *in addition* alter terms that are a fundamental aspect of a creditor's claim. Under *Litton* "*a cure reinstates the original pre-bankruptcy agreement of the parties*." *Litton*, 330 F.3d at 644 (emphasis in original) (quoting *Landmark Financial Services v. Hall*, 918 F.2d 1150, 1154 (4th Cir. 1990)).

19. Allowing the Debtors to cure the default by returning to the pre-default interest rate and monthly payments would be taking a step beyond reinstating the pre-bankruptcy agreement. Instead, the change would modify the Note in violation of § 1322(b)(2), which "prohibits any modification that alters the nature, rate of interest or maturity date of a claim secured only by a security interest in real property serving as the debtor's principal residence." *In re Hubbell*, 496 B.R. 784, 788 (Bankr. E.D.N.C. 2013) (citing *Litton*, 330 F.3d at 644).

20. Similarly, in *Nobleman v. American Sav. Bank*, 508 U.S. 324 (1993), the court found that § 1322(b)(2) could not be used to reduce an undersecured homestead mortgage to the property's fair market value. *Nobleman* provides guidance on what modifications may be made to an agreement under § 1322(b)(5) to allow the curing of a default without violating § 1322(b)(2). Section "1322(b)(5) permits the debtor to cure prepetition defaults on a home mortgage by *paying off arrearages* over the life of the plan 'notwithstanding' the exception in § 1322(b)(2). These statutory limitations on the lender's rights, however, are independent of the debtor's plan or otherwise outside § 1322(b)(2)'s prohibition." 508 U.S. at 330 (emphasis added) (footnote omitted).

21. Arising out of the United States Bankruptcy Court for the Northern District of Texas, *Nobleman* referred to the state law controlling the rights of the parties.

> The bank's 'rights,' therefore, are reflected in the relevant mortgage instruments, which are enforceable under Texas law. They include the right to repayment of the principal in monthly installments over a fixed term at specified adjustable rates of interest, the right to retain the lien until the debt is paid off, the right to accelerate the loan upon default and to proceed against petitioners' residence by foreclosure and public sale, and the right to bring an action to recover any deficiency remaining after foreclosure.

508 U.S. at 329. Citing *Dewsnup v. Timm*, 502 U.S. 410 (1992), the *Nobleman* court emphasized that "[t]hese are the rights that were 'bargained for by the mortgagor and the mortgagee,' and are rights protected from modification by § 1322(b)(2)." *Id.* at 330 (internal citations omitted) (quoting *Dewsnup*, 502 U.S. at 417). Thus, *Nobleman* clearly indicates that arrearages can be cured under § 1322(b)(2), but a loan cannot be modified outside of the four corners of the document.

22.     Holding that cure cannot change the terms of an underlying instrument accounts for the fact that a "contractual default rate of interest is a deliberate bargain among private parties [which] reflects a heightened risk of nonpayment and the unforeseeable cost involved in collected defaulted debt." *In re Adejobi*, 404 B.R. 78, 82 (Bankr. E.D.N.Y 2009) (applying default rate in the context of 11 U.S.C. § 1322(e)).

23.     In the case of the Note, the parties agreed that there would be a less drastic alternative to acceleration and foreclosure in the event of a default, namely that the loan term would continue with increased monthly payment amounts. As seller-financers of the Note, the Hancocks (or their counsel) likely added the alternate default provision as a means of added protection in the event default occurred at a time when the Hancocks were undersecured, given that they would be precluded by state law from seeking a deficiency judgment from the Debtors following foreclosure. *See* N.C. Gen. Stat. § 45-21.38. The default rate, as an alternative to

7

acceleration, was a negotiated and agreed condition of the loan. *Nobleman* discourages tampering with that agreement.

24.    While the Debtors have the right to reverse the acceleration of the Note pursuant to 11 U.S.C. § 1322(b)(5) and cure the arrearages as prescribed by *Nobleman*, they may not extend the terms of the contract and propose a plan with monthly payments at the pre-default rate without running afoul of 11 U.S.C. § 1322(b)(2); now therefore,

It is ORDERED, ADJUDGED and DECREED as follows:

1.    The Debtors' Chapter 13 Plan is confirmed as noticed by the Trustee, except as modified herein;

2.    The Trustee is directed to make payment of commissions and expenses to the Trustee and fees to the Debtors' attorney, Travis P. Sasser, Esq., in the amount of $4,015.00 as reasonable compensation, of which the sum of $0.00 was paid prior to the filing of this case. In the event the fee allowed is less than requested, the Debtors' attorney may request the court to reconsider the fee allowance upon appropriate motion for reconsideration to be filed with the court within twenty (20) days of entry of this Order;

3.    The Debtors' Plan payment schedule shall remain as indicated in the Motion for Confirmation. The Trustee shall disburse funds received pursuant to the terms of the confirmed Plan, and subsequent orders of the Court, and all required thereby to be paid by the Debtors. The Debtors must pay an amount necessary to pay all required claims in full to the Trustee for distribution under the terms of the confirmed Plan before a discharge may be entered;

4.    The pre-petition arrearage claim amount owing to the Hancocks will be paid in full over the life of the Debtors' Plan without interest. Included in the Hancocks' amended claim is pre-petition mortgage arrearage in the amount of $10,375.47. This amount was calculated for

the period of March 5, 2013 through September 16, 2013. The interest portion of the arrearage was calculated using the pre-default contractual interest rate of 5.00% for the period March 5, 2013 through May 31, 2013, and the post-default contractual interest rate of 7.00% for the period June 1, 2013 through September 16, 2013;

5. The principal mortgage balance owing to the Hancocks shall be paid through the Debtors' Plan as a long-term debt, with post-petition monthly mortgage payments calculated based on an interest rate of 7.00%. The monthly mortgage payment at 7.00% is, pursuant to the terms of the Note attached to the Hancocks' amended proof of claim, $1,696.52;

6. As of July 22, 2014, the Trustee has disbursed pre-confirmation adequate protection payments to the Hancocks totaling $12,320.10. This amount represents monthly mortgage payments for the months of October 2013 through June 2014, at $1,368.90 per month. The Trustee shall disburse to the Hancocks, according to his normal disbursement procedures and schedule, an amount from available funds on hand in this case sufficient to cure the deficit between that which has been disbursed to the Hancocks thus far, and the amount necessary to pay all post-petition mortgage payments which have now become due, at the rate of 7.00%;

7. The Trustee is directed to pay administrative expenses and creditors with timely filed proofs of claim pursuant to the Plan, except as specifically modified herein;

8. The Trustee shall make a final report and file a final account of the administration of the estate with the court;

9. The Debtors shall not transfer any interest in real property without prior approval of the court; and

10. This Order does not prejudice the Debtors or Trustee from objecting to claims or from bringing any applicable avoidance action.

END OF DOCUMENT