**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

───────────

**No. 15-1505**

───────────

WILLIAM ROBERT ANDERSON, JR.; DANNI SUE JERNIGAN,

                    Debtors – Appellants,

          v.

WAYNE HANCOCK; TINA HANCOCK,

                    Creditors - Appellees,

JOHN F. LOGAN,

                    Trustee - Appellee.

───────────

Appeal from the United States District Court for the Eastern
District of North Carolina, at Raleigh.   Louise W. Flanagan,
District Judge.  (5:14-cv-00690-FL)

───────────

Argued:  March 24, 2016               Decided:  April 27, 2016

───────────

Before WILKINSON and NIEMEYER, Circuit Judges, and David C.
NORTON, United States District Judge for the District of South
Carolina, sitting by designation.

───────────

Affirmed in part; reversed in part; and remanded by published
opinion.  Judge Wilkinson wrote the opinion, in which Judge
Niemeyer and Judge Norton joined.

───────────

**ARGUED:** Cortney I. Walker, SASSER LAW FIRM, Cary, North
Carolina, for Appellants.  Theodore Adelbert Nodell, Jr., NODELL
GLASS & HASKELL, LLP, Raleigh, North Carolina; John Fletcher
Logan, OFFICE OF THE CHAPTER 13 TRUSTEE, Raleigh, North

Carolina, for Appellees.  **ON BRIEF:** Travis P. Sasser, SASSER LAW
FIRM, Cary, North Carolina, for Appellants.  Michael B. Burnett,
OFFICE OF THE CHAPTER 13 TRUSTEE, Raleigh, North Carolina, for
Appellee Logan.

_____

WILKINSON, Circuit Judge:

In a case where the rate of interest on the debtors' residential mortgage loan was increased upon default, we consider whether a "cure" under § 1322(b) of the Bankruptcy Code allows their bankruptcy plan to bring post-petition payments back down to the initial rate of interest. We hold that the statute does not allow this, as a change to the interest rate on a residential mortgage loan is a "modification" barred by the terms of § 1322(b)(2).

                                I.

On September 1, 2011, William Robert Anderson, Jr. and Danni Sue Jernigan purchased a home in Raleigh, North Carolina, from Wayne and Tina Hancock. The purchase was financed via a $255,000 loan from the Hancocks. In exchange for the loan, Anderson and Jernigan granted the Hancocks a deed of trust on the property and executed a promissory note requiring monthly payments in the amount of $1,368.90 based on an interest rate of five percent over a term of thirty years.

The note provided, however, that

> In the event borrower has not paid their monthly obligation within 30 days of the due date, then borrower shall be in default. Upon that occurrence, the borrower's interest rate shall increase to Seven percent (7%) for the remaining term of the loan until paid in full. The increase in interest rate shall result in a new payment amount of $1696.52, which shall be due and payable monthly according to the

> terms stated herein, save and except the increase in rate and payment.
>
> As an alternative to an increase in interest rate upon default occurring 30 days after the payment due date, lender may, in the lender's sole discretion either 1) require borrower to pay immediately the full amount of principal which has not been paid and all the interest that I owe on that amount. The date for the full amount of principal must be at least 30 days after the date on which notice is mailed to the borrower or delivered by other means or 2) pursue any other rights available to lender under North Carolina Law.

J.A. 27.

On April 1, 2013, Anderson and Jernigan failed to make their monthly payment. On May 4th, 2013, after continuing to receive no payment, the Hancocks notified Anderson and Jernigan that they were in default and that future payments should reflect the increased seven percent rate of interest provided for in the note. Anderson and Jernigan responded on May 6, 2013, asking for a chance to become current on arrears. They nonetheless failed to make any further payments, and on June 3, 2013, the Hancocks again informed them that they were imposing the seven percent rate of interest for the remaining term of the loan.

On August 30th, having continued to receive no payments, the Hancocks initiated foreclosure proceedings. Anderson and Jernigan in turn filed a Chapter 13 bankruptcy petition in the Eastern District of North Carolina on September 16, 2013, invoking bankruptcy's automatic stay and halting foreclosure

proceedings. They also filed a proposed bankruptcy plan contemporaneous with their bankruptcy petition. Aspects of that plan are at issue here.

The bankruptcy plan proposed to pay off prepetition arrears on the Hancock loan over a period of sixty months. Arrears were calculated using a five percent interest rate. The plan also reinstated the original maturity date of the loan, and proposed that the debtors again make post-petition payments at a five percent interest rate.

The Hancocks objected, contending that post-petition payments should continue to reflect the seven percent default rate of interest provided for in the promissory note. They also argued that arrears to be paid off over the life of the plan should be calculated using a rate of seven percent interest beginning in June, 2013.

The bankruptcy court sustained the Hancocks' objection. It held that the change to the default rate of interest ran afoul of 11 U.S.C. § 1322(b)(2), which prevents plans from "modify[ing]" the rights of creditors whose interests are secured by debtors' principal residences. It rejected Anderson and Jernigan's argument that the increased rate of interest was a consequence of default that bankruptcy could "cure" consistent with the allowances afforded to bankruptcy plans in § 1322(b)(3) and (b)(5). The bankruptcy court also held that arrears on the

5

loan should be calculated using a seven percent rate of interest for the period extending from June 1 though September 16, 2013. It entered an order confirming the plan as modified according to its opinion.

Anderson and Jernigan appealed to the district court, again arguing that their bankruptcy plan should be allowed to "cure" the increased default rate of interest. The district court, like the bankruptcy court, rejected this claim. It held that setting aside the seven percent default rate of interest would be a modification that is prohibited by statute.

The district court disagreed, however, with the bankruptcy court's interpretation of the promissory note. In particular, it held that acceleration and foreclosure was a "disjunctive alternative remedy" to the default rate of interest, and that once the Hancocks accelerated the loan, the rate of interest reverted back to five percent. J.A. 71. It held that this period of acceleration (and thus only five percent interest) lasted from September 16, 2013 until December 2013 (the effective date of the plan), after which the seven percent rate of interest re-activated due to the bankruptcy plan's deceleration of the loan. In the district court's view, the rate of interest thus see-sawed depending on whether the loan was in accelerated or decelerated status.

Anderson and Jernigan again appeal, contending that a cure under the Bankruptcy Code may bring the loan back to its initial rate of interest. We, however, agree with the courts below on the basic question, namely that the cure lies in decelerating the loan and allowing the debtors to avoid foreclosure by continuing to make payments under the contractually stipulated rate of interest.

## II.

Evaluating Anderson and Jernigan's claim requires us to examine the language of the § 1322(b). Section 1322(b)(2) provides that a bankruptcy plan may "modify the rights of holders of secured claims, other than a claim secured only by a security interest in real property that is the debtor's principal residence." Claims secured by security interests in the debtor's principal residence may be modified only if "the last payment on the original payment schedule" is due before the due date of the last payment under the plan, 11 U.S.C. 1322(c)(2), an exception which does not apply here. Plans may also "provide for the curing or waiving of any default," 11 U.S.C. § 1322(b)(3), and may,

> notwithstanding paragraph (2) of this subsection, provide for the curing of any default within a reasonable time and maintenance of payments while the case is pending on any unsecured claim or secured claim on which the last payment is due after the date on which the final payment under the plan is due.

11 U.S.C. § 1322(b)(5). The question is therefore whether the plan's proposed change to the debtors' rate of interest is part of a "cure" permissible under § 1322(b)(3) and (5), or alternatively, is a "modification" forbidden by the terms of paragraph (2).

The loan is secured by the debtors' principle residence, and so Section 1322(b)(2) forbids "modification" of the Hancocks' "rights." While "[t]he term 'rights' is nowhere defined in the Bankruptcy Code," the Supreme Court has held that it includes those rights that are "bargained for by the mortgagor and the mortgagee" and enforceable under state law. Nobelman v. Am. Sav. Bank, 508 U.S. 324, 329 (1993). Courts have accordingly "interpreted the no-modification provision of § 1322(b)(2) to prohibit any fundamental alteration in a debtor's obligations, e.g., lowering monthly payments, converting a variable interest rate to a fixed interest rate, or extending the repayment term of a note." In re Litton, 330 F.3d 636, 643 (4th Cir. 2003).

The language of § 1322(b)(3) and (5) does not undo this protection of residential mortgage lenders' fundamental rights. Congress would not inexplicably make (b)(2) inoperative by means of a capacious power to cure written only a few sentences later. We interpret § 1322(b) "as a whole, giving effect to each word and making every effort not to interpret a provision in a manner

8

that renders other provisions . . . inconsistent, meaningless or superfluous." <u>Boise Cascade Corp. v. U.S. E.P.A.</u>, 942 F.2d 1427, 1432 (9th Cir. 1991). And while (b)(3) provides that a plan may "provide for the curing or waiving of any default," (b)(5) suggests that the core of a "cure" lies in the "maintenance of payments." 11 U.S.C. § 1322(b)(5).  One authoritative treatise, in its section explaining the purpose of § 1322(b)(5), comments that

> Section 1322(b)(5) is concerned with relatively long-term debt, such as a security interest or mortgage debt on the residence of the debtor. It permits the debtor to take advantage of a contract repayment period which is longer than the chapter 13 extension period, which may not exceed five years under any circumstances, and may be essential if the debtor cannot pay the full allowed secured claim over the term of the plan.
>
> The debtor may maintain the contract payments during the course of the plan, without acceleration based upon a prepetition default, by proposing to cure the default within a reasonable time.

8-1322 Collier on Bankruptcy P 1322.09 (15th 2015). The meaning of "cure" thus focuses on the ability of a debtor to decelerate and continue paying a loan, thereby avoiding foreclosure.

The context of § 1322(b)'s enactment confirms this understanding. While "the text is law," legislative history that "shows genesis and evolution" can sometimes give a "clue to the meaning of the text." <u>Cont'l Can Co. v. Chicago Truck Drivers, Helpers & Warehouse Workers Union (Indep.) Pension Fund</u>, 916

9

F.2d 1154, 1157-58 (7th Cir. 1990). Section 1322(b) was part of the Bankruptcy Act of 1978. Pub. L. No. 95-598, 92 Stat. 2549. An early Fifth Circuit opinion details its origins. The court explains that "during a Senate committee hearing . . . the secured creditors' advocates advanced no objection to the curing of default accelerations." Grubbs v. Houston First Am. Sav. Ass'n, 730 F.2d 236, 245 (5th Cir. 1984). Instead, "their attack concentrated upon provisions that permitted modification of a secured claim by reducing the amount of periodic installments due thereupon." Id. The Senate subsequently amended (b)(2), which in its prior version would have allowed modification of any secured claim, to exclude modifications of claims "wholly secured by mortgages on real property," and later, after reconciliation with the House, claims "secured only by a security interest in real property that is the debtor's principal residence." Id. at 245-46. This language survives today. The implication, then, is that while Congress meant to allow debtors to decelerate and get a second chance at paying their loans, "home-mortgagor lenders, performing a valuable social service through their loans, needed special protection against modification," including modifications that would "reduc[e] installment payments." Id. at 246.

Congress has thus drawn a clear distinction between plans that merely cure defaults and those that modify the terms of

10

residential mortgage loans. Understanding that the meaning of "cure" focuses upon the "maintenance" of pre-existing payments, see 11 U.S.C. § 1322(b)(5), we therefore hold that turning away from the debtors' contractually agreed upon default rate of interest would effect an impermissible modification of the terms of their promissory note. See 11 U.S.C. § 1322(b)(2).

Anderson and Jernigan object, citing one of our cases for the proposition that a cure is anything that "reinstates a debt to its pre-default position, or [] returns the debtor and creditor to their respective positions before the default." Appellants' Br. at 10-11 (quoting Litton, 330 F.3d at 644). In the debtors' view, a cure thus unravels every consequence of default, and "[r]eturning to pre-default conditions for an increased interest rate requires decreasing the interest rate back to its pre-default amount." Appellants' Br. at 16.

But Litton's invocation of "pre-default conditions" again contemplates the deceleration of otherwise accelerated debt. It speaks of a cure as a reinstatement of "the original pre-bankruptcy agreement of the parties," or "a regime where debtors reinstate defaulted debt contracts in accordance with the conditions of their contracts." Litton, 330 F.3d at 644. And "the original pre-bankruptcy agreement of the parties" here specified a higher, default rate of interest upon missing a payment.

11

Even more problematic for appellants is Litton's disapproval of plans that attempt to "lower[] monthly payments" or "convert[] a variable interest rate to a fixed interest rate." Litton, 330 F.3d at 643. Here, by reducing the interest rate from seven percent back to five percent, the debtors would lower their monthly payments from $1,696.52 to $1,368.90 for the remaining life of the loan. Contrast Litton, where the plan "did not propose the reduction of any installment payments." 330 F.3d at 644-45. And while a default rate of interest may not be a variable interest rate in the classic sense – it does not vary with any underlying index – it is a rate that varies upon the lender's invocation of default.

The debtors' position would eliminate the possibility of this variance for at least some period preceding bankruptcy. This again contravenes Litton. It also contravenes numerous other decisions using interest rates as a prime example of what a residential mortgage debtor may not modify in bankruptcy. See, e.g., Nobelman, 508 U.S. at 329 (rights safe from modification include "the right to repayment of the principal in monthly installments over a fixed term at specified adjustable rates of interest"); In re Varner, 530 B.R. 621, 626 (Bankr. M.D.N.C. 2015) ("The Debtors' current plan proposes to modify CitiFinancial's claim by lowering the interest rate to 5.25%, which violates § 1322(b)(2).").

12

Litton and other cases' rejection of plans that tamper with
residential mortgage interest rates is altogether sound. The
interest rate of a mortgage loan is tied up with the "payments"
that a legitimate cure requires must be "maintain[ed]." 11
U.S.C. § 1322(b)(5). Absent foreclosure and bankruptcy, the
debtors would have been required to make payments totaling
$1,696.52 per month based on a seven percent interest rate.
Reducing the interest rate to five percent would lower this
monthly amount to $1,368.90. That would "hardly constitute[]
'maintenance of payments.'" In re McGregor, 172 B.R. 718, 721
(Bankr. D. Mass. 1994). "The phrase connotes an absence of
change." Id. In order to cure and maintain payments, the debtors
must, as the district court put it, "mak[e] the same principal
and interest payments as provided in the note." J.A. 70 (quoting
In re Martin, 444 B.R. 538, 544 (Bankr. M.D.N.C. 2011)).

We therefore reject the debtors' attempt to modify the
terms of their residential mortgage loan. It is contrary to
Congress's prescription in § 1322(b)(2). The post-petition
payments here should reflect the parties' agreed upon default
rate of interest – seven percent.

## III.

Anderson and Jernigan view this as an unfair result,
stressing that "[t]he principal purpose of the Bankruptcy Code
is to grant a fresh start to the honest but unfortunate debtor."

13

Appellants' Br. at 18 (quoting Marrama v. Citizens Bank of Mass., 549 U.S. 365, 367 (2007)). But such a view wrongly assumes that a textually sound reading of § 1322(b) must perforce be inimical to the welfare of mortgage debtors.

That need not be the case. Interest rates, including default interest rates, serve at least two recognizable purposes. First, interest rates "represent[] compensation for the time value of money." Dean Pawlowic, Entitlement to Interest Under the Bankruptcy Code, 12 Bankr. Dev. J. 149, 173 (1995). They are "the price or exchange rate that is paid to compensate a lender who foregoes current spending or investment opportunities to make a loan." Id. Compensation for the time value of money also includes compensation for the risk of inflation and the principal's "expected loss in purchasing power." Id. at 174. Second, interest rates serve as compensation for taking on risk – the uncertainty regarding "actual return." Id.

The portion of an interest rate that compensates for risk is known as the "risk premium." Id. While unsecured creditors face the obvious risk of principal loss, secured creditors like the Hancocks also face a variety of risks. First, there is the risk of collateral depreciation. "If the debtor defaults, the creditor can eventually repossess and sell the collateral," but depreciation may make the collateral less valuable than the

14

principal balance on the loan. Till v. SCS Credit Corp., 541
U.S. 465, 502 (2004) (Scalia, J., dissenting). Second, there is
the risk of incurring losses in foreclosure. "Collateral markets
are not perfectly liquid"; a secured creditor liquidating
collateral may not be able to achieve the price it might wish to
demand. Id. at 502-03. The administrative expense of foreclosure
would likely also cause various losses. Id. at 503.

When debtors like Anderson and Jernigan miss payments or
otherwise default, they reveal an increased likelihood that
secured creditors will realize these risks. But just as
statisticians update their probability estimates of a given
outcome whenever they receive new information, see generally
Enrique Guerra-Pojol, Visualizing Probabilistic Proof, 7 Wash.
U. Juris. Rev. 39 (2014), lenders may use default interest rates
to increase risk premiums whenever events reveal that their
debtors may be riskier than the lenders might have thought
initially.

By enforcing Anderson and Jernigan's default rate of
interest, we therefore do not mean to "compromise[]" their
ability to "cure their default and obtain a true fresh start."
Appellants' Br. at 18. Instead we mean only to enforce the text
of the statute and to allow the mortgage market to continue to
correct for imperfect information on debtor risk. Default
interest rates allow creditors to adjust upward for increased

15

risk (rather than immediately foreclose and exit the loan) when the initial risk premium is revealed to have been too low. Eliminating this tracking ability when debtors are revealed to be more risky than ever – when they have gone bankrupt – would practically compromise much of the default interest rate's utility.

Inability to impose a practically useful default rate of interest would have predictable negative effects upon the home mortgage lending market. Without a less drastic alternative remedy for default, creditors might be more likely to push for early foreclosure. And rather than give "[t]he debtor [] the benefit of the lower rate until the crucial event occurs," creditors might cover their risk on the front end and require "a higher rate throughout the life of the loan." See Ruskin v. Griffiths, 269 F.2d 827, 832 (2d Cir. 1959); see also In re Vest Associates, 217 B.R. 696, 701 (Bankr. S.D.N.Y. 1998) ("The inclusion of a default rate actually may benefit a debtor because [the debtor] has the benefit of a lower rate until an event triggering default occurs.").

Inability to impose default rates of interest might also motivate fewer lenders to engage in mortgage lending in the first place. "[F]avorable treatment of residential mortgagees was intended to encourage the flow of capital into the home lending market." Nobelman, 508 U.S. at 332 (Stevens, J.,

16

concurring). Undermining § 1322(b)'s protections for home mortgage lenders might benefit the debtors before us in this case, but "it could make it more difficult in the future for those similarly situated . . . to obtain any financing at all." In re Witt, 113 F.3d 508, 514 (4th Cir. 1997).

Anderson and Jernigan are thus incorrect to suggest that the "legislative history and guiding principles of bankruptcy," Appellants' Br. at 17, allow them to modify a residential mortgage loan's default rate of interest. The drafters of § 1322(b) "had to face the reality that in a relatively free society, market forces and the profit motive play a vital role in determining how investment capital will be employed." In re Glenn, 760 F.2d 1428, 1434 (6th Cir. 1985). "Every protection Congress might grant a homeowner at the expense of the holders of security interests on those homes would decrease the attractiveness of home mortgages as investment opportunities," thereby "shrink[ing]" the "pool of money available for new home construction and finance." Id. In the face of this dilemma, Congress chose to allow mortgage debtors to cure defaults and maintain payments on their loans, but also to prohibit "modification of the rights of home mortgage lenders." First Nat. Fid. Corp. v. Perry, 945 F.2d 61, 64 (3d Cir. 1991). It made this choice in the hopes that protection from modification would "make home mortgage money on affordable terms more

17

accessible to homeowners by assuring lenders that their expectations would not be frustrated." Id.

Anderson and Jernigan's attempt to undermine § 1322(b)(2)'s protections would upset this deliberative balance. Neither creditors nor debtors would benefit. We accordingly reject the view that the spirit of bankruptcy requires tampering with the debtors' agreed-upon interest rate, and we hold Anderson and Jernigan to the text of the statute and to the terms of their bargain.

IV.

While we agree with the district court that payments after the December 2013 effective date of the plan should reflect a seven percent rate of interest, we disagree with its holding that a five percent rate of interest should apply to payments calculated between September 16, 2013, and December 2013. The district court based this conclusion on the premise that the default rate of interest was a "disjunctive alternative remedy" to acceleration and foreclosure. J.A. 71. That, however, is not a plausible construction of the promissory note.

Under the district court's view, the debtors might incur the default rate of interest, maintain payments thereon for a decade or more, and then suddenly experience a five percent rate of interest upon further default and acceleration. We are doubtful that the parties would have expected this outcome.

18

While the text of the note admittedly labels acceleration "[a]s an alternative to an increase in interest rate," J.A. 27, that does not answer the question. In our view, the "alternative" of acceleration was a more-severe sanction that would likely be invoked only after the less-severe default rate of interest had failed. Nothing in the contract indicates that the parties intended for its invocation to unravel the earlier, less-severe remedy.

All post-petition interest payments, including those from September 16, 2013 through December 2013, should therefore reflect the parties' negotiated seven percent default rate of interest. The bankruptcy court, which affirmed the plan as modified to reflect a seven percent rate of interest for arrearage accrued from June 1, 2013 through September 16, 2013, and which required that all post-petition mortgage payments reflect the seven percent default interest rate, had it right.

We accordingly affirm the judgment of the district court insofar as it required that post-petition interest payments be calculated using the seven percent default rate of interest, but we reverse that part of the judgment which applied only a five percent rate of interest to payments calculated "for the period between September 16, 2013 and the December 2013, effective date

19

of the plan." J.A. 72. We remand the case to the district court

for further proceedings consistent with this opinion.


AFFIRMED IN PART; REVERSED IN PART; AND REMANDED